First case in our call this morning is agenda number one, case number 106566, People of the State of Illinois v. Eric Hanson. Counsel, you may proceed. Thank you, Your Honor. Good morning. My name is Stephen Clark. I represent Mr. Hanson. It's been seven years since the mass clemency of death sentences in Illinois and the reforms that this court adopted in its rules and the reforms that the legislature adopted. And since then, I've been studying the cases that have come before this court with death sentences. And I've noticed that in addition to having many fewer death sentences per year, the cases which this court sees have a lot stronger evidence of guilt than before. There are no more, not to my knowledge anyway, no snitch testimony. There's almost always some strong forensic evidence against the defendant. There's usually a confession. There's usually eyewitnesses. And there's usually some combination of circumstances. Whereas when I first started doing death penalty litigation in the 80s in this court, there were a lot of circumstantial evidence cases. There were a lot of informants. There were a lot of accomplice witnesses. There were a lot of snitches. And there wasn't very much forensic evidence. And the relevance of that difference to this case is that this case is somewhat of a throwback in that we're dependent on circumstantial evidence of guilt in this case. There's no confession. There's no eyewitnesses. And the forensic evidence is actually cutting both ways. It points to two offenders rather than one. And while it ties the defendant to his parents and the other two murder victims, his sister and his brother-in-law, there's really no forensic evidence which incriminates my client. There is, of course, the fact that in his vehicle when he was arrested there were some latex gloves found in a plastic bag that may have had the victim's blood on it. We know it was their DNA. Strike that. It matches their DNA in terms of having the same markers. And also there was a presumptive blood test run on those gloves which suggests there was blood there. But there was a fingerprint on that plastic bag which wasn't my client's and wasn't matched to anyone involved in this case. And that's a concern to me as to how those gloves got in my client's car. And at the first murder scene, the sister and brother-in-law's home where there was blood all over the place, there were two shoe prints that were never matched to anyone or to any pair of shoes, I guess I should say, or pairs of shoes. And that suggests there were multiple offenders. And in the car that the state theorizes was used to transport the parents' bodies from their home to the sister's home, there were also unmatched fingerprints. Another circumstantial item which was very damaging to my client was the fact that in his car, in addition to these gloves, there was a watch which belonged to the brother-in-law, and there was a ring which was the engagement ring of Catherine. And my client testified that those items had been left at his parents' home, and he was going to bring them back to his sister and his brother-in-law, but he forgot to do so. There was, however, a videotape from a store in which Catherine was a customer a few hours before she was murdered, and although that tape was of poor quality, the video didn't show a ring on Catherine's hand. And so I'm suggesting that there are some problems with the state's theory that my client committed these murders alone. And in that concert... Could your client's theory be rejected and the state still win? Could... In other words, your theory is that it was the multiple offenders? Yes. And I'm suggesting... Their theory was what? Right. That could be rejected and the defendants could still be guilty, isn't that correct? Sure. Okay. All I'm trying to do, Mr. Chief Justice, is suggest this is not an overwhelming case and that the errors which I'm going to go on to now should not be held harmless there, because the jurors were distracted from the possibility that there were two other offenders with two different shoe patterns and that the other offenders would have matched these unmatched fingerprints. And it would better explain such things as how this fire was burning so strongly four hours after we know my client went to Midway Airport. All these things suggest to me that the state's theory that my client acted alone could be wrong and that there could have been two other offenders who committed the crime and may even have thrown this bag of bloody gloves into my client's car. Now I'd like to go on to these errors that I think were committed during the trial and I'll finish with the sentencing issues. The first thing that troubles me is that the jury several times heard that the defendant's surviving sister, Jennifer, was of the opinion that my client was guilty. Now to me this is extremely prejudicial because no one knew the victims and the defendant better than the defendant's sister. And for the jury to hear that she believed that the defendant was guilty was compelling evidence. It would have been something that the jurors would have been impressed with. They would have likely discussed how damaging that was to the defendant. Now in my opinion such opinion testimony has no relevance and shouldn't have been admitted. There was a motion in limine filed and it was denied. On cross-examination of Jennifer, defense counsel tried to blunt this by suggesting that that had led to a rush to judgment by the police. And then later when the detective testified that Jennifer had told him that he believed, she believed the defendant was guilty, the jury heard it again. Now the state argues that this was relevant to show that... Excuse me, before you get into the relevance, how do you address what I believe is a waiver argument made by the state based on what you had just talked about, that the defense elicited the testimony on cross-examination for the purpose of that being told to the police and then rushing to judgment? Is that a waiver as to the issue? No, sir. In my reply brief I cited three cases from this court which hold that when a motion in limine is denied, that preserves the issue even if the defense subsequently goes into that evidence. And that should be the law, as it has been in this court for a number of years, because defense counsel can't just sit back and take the most damaging aspects of improperly admitted testimony. He has an obligation to defend his client as best he can by trying to blunt that evidence. And here defense counsel tried to do that by suggesting that that irrelevant opinion of Jennifer was used by the police to make a rush to judgment. Was the statement necessary or appropriate to explain the police investigation? Thank you. Yes, no, is the answer to that question. It was not. The state argues that the police investigation is a necessary element and more to the point that it puts my client's response to the police officer's statement of this in some kind of context and explains why he said it. But neither of those things is important, relevant, or necessary on the facts of this case. The state relies on a case where the defendant confessed to his brother and then the police confronted him with his confession to his brother and then he confessed again. But the facts here are that when confronted by the police officer with Jennifer's opinion of his guilt, my client said, oh, I understand why you're talking to me. And I don't think that the statement, I understand why you're questioning me or talking to me, is in any way incriminating, any way relevant to guilt or innocence. And even if it was, that statement could have been brought out without the prejudicial opinion of his sister. So it wasn't relevant and it was greatly prejudicial. Now I'd like to move on to another error, which I believe occurred, and that's that three times the jury heard that the Los Angeles police considered the defendant potentially dangerous very dangerous or merely dangerous. And that had no relevance. It was their opinion. It was hearsay. It should never have come out. The first time it came out, there was an objection and the judge correctly sustained the objection and told the jury not to consider it. The second time it came out, defense counsel inexplicably didn't object to it and the jury was left free to consider it. The third time it came out, defense counsel again objected and the judge again sustained the objection, but this time rather than telling the jury to disregard it, he said that it was relevant to show what the witness did next, but couldn't be considered for the truth of the matter asserted. And what the witness did next was get onto a telephone and call, this was a Southwest Airlines employee. The defendant was flying back from Los Angeles to Chicago. What the witness did next was make a phone call. But the fact that a phone call was made really has no relevance because, although the state theorizes that my client must have thought, oh, they're calling the police or something, and therefore he changed flights and flew back to Chicago and instead of going to Naperville to talk to the police, he fled through Wisconsin. The point is that my client had no way of knowing what this phone call was about, therefore it had no relevance. And the Los Angeles police opinion that my client was extremely dangerous had no relevance. But the jury must have been struck by, well, the Los Angeles police think that Eric is a dangerous person. If they think he's a dangerous person, that increases a juror's belief that he's guilty of the offense in question. Now, finally, in terms of the trial issues, I want to- Southwest Airlines agent or whatever, she reported defendant's presence to her supervisor, right? That was her testimony? Right. And the trial judge in the second limiting instruction said, you're only to consider that only insofar as it explains what she did in talking to her supervisor. Right. But you can't consider it as being a truthful statement just insofar as it explains what she did. Right. I'm just trying to-you had made some mention, and I missed it, with respect to that your client had no way of getting into the conversation. Did the agent even go into the conversation with the supervisor? The record doesn't show how far my client was away, whether my client could hear what she was saying, whether my client knew who she was calling. So I don't think the record shows that what the defendant did when changing flights was a reaction to this telephone call. I think the record just shows that the L.A. police had told Southwest Airlines that the defendant was very dangerous, and that's what the jury took away from it. And your question also reminds me, I should say, that these different reactions to these three different references to the defendant being considered dangerous by the Los Angeles police must have led the jury to be very confused about what they could consider and what they couldn't consider. At least once there was no objection, and so the jury was led to believe they could consider that the Los Angeles police thought he was dangerous. Then there were two inconsistent instructions on to what degree they could consider it. So my point is that the jurors must have thought it was confusing as to whether they could consider it, and it was therefore damaging to my client. All right. But one thing that is consistent in the two instructions is the judge said that you can't consider it for the truth, right? You would agree to that? Right. Okay. But there was one time he didn't give that instruction. Lastly, for the trial issues, I want to talk about the jurors hearing that my client had threatened to kill his sister, Catherine, who was indeed murdered. And this brings up the forfeiture by wrongdoing evidence rule or hearsay exception or confrontation clause exception. And in my work we're seeing a lot of this. Every capital case in the last year where the defendant knew the victims, prosecutors are seeking evidence of something the victim said about the defendant. Now, my position here is that this case is unlike Stackley or Lovejoy or the other cases that this court has considered forfeiture by wrongdoing for two reasons. One is that in Stackley, as a good example, you have testimonial evidence, which was highly, testimonial statements which were highly reliable by the victim in the sense that the victim made solemn statements to the police or to medical staff about a prior sexual assault. And you had similar evidence in Lovejoy, and there are other cases where this court is going to be confronting this. But here we have a prior statement by Catherine to her sister. There's three different dates given by her sister as to when this conversation took place. And I'm troubled by the lack of reliability about this statement because it's not testimonial, because none of the traditional hearsay exceptions apply to it, and because two sisters talking in a telephone conversation saying that this is something that can't go outside the family just doesn't have any of the indicia of reliability, which I think the forfeiture by wrongdoing would help. Wasn't Catherine's statement confirmed by the defendant's letter to his cousin? Partially. His letter to his cousin said, I told Catherine to stay out of my business or she would regret it. And then Catherine was said to respond, is that a threat? And the defendant said it was a promise. That was easily characterized as a threat, but it was a threat that fell far short of I'm going to kill you. And also the threat, as Jennifer testified to it, as related to her from Catherine, used some profanity and was much more prejudicial than the vague threat in the letter. So my answer to your question, Justice Freeman, is it's only inadequately corroborated to be sufficiently reliable to allow the jury to hear this hearsay that my client had threatened to kill. Well, further to the threat recount in the defendant's letter, was that similar to an exchange he had with Allison, his ex-fiancee? Yes. According to Allison, he made a similar statement to her, not I'm going to kill you, but it was similar to what he recounted in his letter to his cousin, something to the effect of, you've got to stay out of my business or you're going to regret it. And your response on reliability as to that, even coupled with the letter, would be the same response you just made on the letter? Yes, because Allison testified that he used that same language that he used in the letter. That suggests that the language of the threat was you're going to regret it, not I'm going to kill you. And do you agree with the state that the defendant doesn't challenge the trial court's finding that he killed Catherine with the intent to prevent her from testifying? It's more a legal argument as to whether it should be elicited at all. There is not an issue here relating to that. Right. I am not protesting the judge's finding that there may have been a motive, at least by a preponderance, to keep somebody from testifying. But once that determination is made by a trial judge, I think the trial judge needs to go on and consider is this testimonial? Is it reliable? Is there any corroboration? And the trial judge didn't do that. And let me give you an example of let's say that instead of allegedly Catherine saying, the defendant threatened to kill me, what if she had said something like, I had a dream last night that the defendant is going to kill me. There's no basis to know whether that's reliable, and forfeiture by wrongdoing cannot be a rule that allows anything prejudicial to the defendant that a murder victim says to come in. All I'm suggesting is that this court needs to carefully consider the scope of forfeiture by wrongdoing. And to give you an example, the Illinois legislature, since this trial, has passed two codifications of forfeiture by wrongdoing. The first, 115.10.6, includes a requirement of reliability. The second, 10.7, doesn't. I pray that you recognize the wisdom of the first and reject the short-sightedness of the second. Well, if this statute was passed after the commission of this offense, are you arguing that we ought to apply that to this case? Or are you saying we should rely on the common law? And if it is, was reliability required there? Common law apparently doesn't require reliability, and I think common law is applicable to this case. And these statutes are not applicable to this case. But I'm suggesting to you that Illinois evidence law, which this court establishes, should require reliability, because if it doesn't, you're going to have a lot of unreliable hearsay coming in under forfeiture by wrongdoing hearsay and confrontation clause exceptions. Now I want to move on to the most prejudicial of the sentencing errors. In mitigation, the defense presented a... Before you do, I'm sorry, Mr. Clark, doesn't the statute now require a finding of reliability? The statute I cited in my briefs does. Right. It wasn't in effect at the time. Right. But after that statute and after my first brief was filed, the legislature passed a second forfeiture by wrongdoing statute, 115-10.7, and it does not require reliability. So no requirement, requirement, and now no requirement. Right. Okay, now, a retired prison warden testified to the jury in mitigation about the conditions that a death row inmate or a life in prison inmate would experience at a place like Menard or Pontiac or Stateville. And inexplicably, in the course of the direct examination, defense counsel asked this witness, what would happen to Eric if he took out a correctional officer? And the witness answered, well, he could be put in segregation or his disciplinary grade could be changed. On cross-examination, the prosecutor seized upon that question, that opening, perceiving that it opened the door to going into other examples of how, or specific examples of prison murders by inmates of correctional officers or correctional staff from the years 1865, when Abraham Lincoln was president, until 2007, when there was a murder of a correctional officer at Stateville. But didn't the defense counsel begin this line of questioning by suggesting that he'd be deterred from violence because of the rules that were in place in the prison? Yes, I just stated that. He did. The defense counsel said, Mr. Witness, what would happen if my client took out a correctional officer? And the witness answered, he would be disciplined with segregation. Well, if that is, that being the case, why isn't this fair questioning when the door's been opened to how, to, I mean, the suggestion is he would be confined, nobody would be injured. When the door is opened, it's opened by testimony that's harmful to the opposing litigant. Here, defense counsel actually prejudiced Eric by suggesting that Eric might be a future danger. So the prosecution wasn't prejudiced by that, and so there was no need for them to drive the nail deeper by going into completely irrelevant other examples of specific murders by other people of correctional officers. Is this an ineffective assistance to counsel argument? Yes. It was ineffective to ask the question in the first place, and it was even more ineffective to not object to the cross-examination when it went on for several pages, talking about in 1980 there was a murder at a media security prison of a specific correctional officer, and then again in 1980, or in the 1980s, there was another person murdered at Menard. Did you frame it as an ineffective assistance to counsel argument? Yes, sir, I did. Okay. I also argued it was plain error. I tried to cover the waterfront. My point is that the opening the door rationale doesn't work here on these facts. And let me put it to you this way. If the defense, if the prosecution had asked about some future dangerousness thing, it certainly wouldn't have been proper cross-examination for the defense to bring out all the examples of good conduct by every inmate in the Department of Corrections. And so the reverse is also true. You simply cannot have aggravation that has nothing to do with my client as an individual. Aggravation has to be focused on the individual defendant, just as mitigation does. And in this instance, the prosecution was asking, was suggesting to the jury that they needed to safeguard correctional officers for conduct that my client had no knowledge of or no role in. Can you see any strategic reason for the defense counsel to ask that question in the first place? No. I think he... Was he trying to paint a picture for the jury that this person, even if a threat that there were ways to handle him in prison... The questions leading up to this take out a guard question were suggesting that. They were asking questions like, well, what if the... I can't remember them exactly, so I'm paraphrasing, and I want to make that clear. He was asking questions like, well, what if the defendant is insolent to a guard? Or what if the defendant doesn't follow the rules? And the answers were, well, he can be punished. He can lose his privileges on death row. He can be reduced in grade and things like that. And then I think defense counsel just wasn't thinking very clearly and asked about taking out a guard. And that was really damaging to Eric because it suggested he might do that. And then it got much more damaging when the prosecution seized upon that to further prejudice him with all this irrelevant stuff about what other inmates did in 1980 and in 2007 at other correctional facilities. So for those reasons, I'm asking your honors to grant my client either a new trial or to set aside his death sentence in order that he be given a new death penalty hearing. Thank you. Good morning, Your Honor. May it please the Court, I'm Assistant Attorney General Eric Levin. On behalf of the people of the State of Illinois. I'd like to start briefly, unless the Court has another preference, I'd like to start briefly addressing some of the evidentiary or the evidence issues that my colleague just addressed. At the outset, it's important to note that the defendant has never, neither his opening brief and his reply brief or now, made a sufficiency of the evidence challenge. So these factors or this evidence is relevant only insofar as it goes to the plain error or Strickland analyses. And those are important because all but one of defendant's evidentiary claims were not preserved for review and are subject either to plain error analysis or to Strickland analysis. So if I could start with those just briefly. It's important to note here, it's true, there was no direct physical evidence linking the defendant to these crimes, but there was an extremely overwhelming amount of circumstantial evidence here. By the defendant's own testimony, he put himself in his parents' house at the very time his parents were being shot. Three gunshots, drilling into the headboards, moving of the bodies, opening of the garage door, moving of mattresses. Yet the defendant claimed he heard none of this. We know, however, from Allison Beck's testimony that one, the defendant was a very light sleeper, and two, that from that basement bedroom you could hear what was going on on the floors above. We also know that he told his cousin Bob Stuttleberg that he didn't sleep at all the night before, that his back hurt. We know from the neighbor's testimony that at about 1.50 in the morning when she went out to walk her dog, every single light in that house was on, including the above ground basement bedroom window. So the defendant was not sleeping through this. We know he was awake. He then fled to California, surreptitiously returned to Illinois. He was still telling Detective Niles that he was in Los Angeles. In fact, he was back in Illinois, and he was then later arrested as he drove north through Wisconsin. This evidence of flight is consciousness of guilt. When he was arrested, in his car were found his sister's wedding ring, his brother-in-law's Rolex watch, and a bag with two pair of latex gloves with his blood on them matching his father's DNA and consistent with his mother's DNA. His explanations for how these things were in his car are just implausible. He's given different stories about how the Rolex watch was there. At trial, I believe he testified that Jennifer had brought it over, or I'm sorry, Catherine had brought it over to their parents' house on the previous day, and he was returning it. Jennifer, however, testified that in a letter that the defendant wrote to her after he was arrested, he gave a different explanation. At that time, he said that James no longer wanted the watch and gave it to Terrence Hansen, who then gave it to him. So he's given different stories on this. The story about how the sister's $30,000 wedding ring got into his possession is just implausible. Jennifer testified that she did not take that wedding ring off. She would not have just left it at her sister's house. What was the response to the videotape at the store regarding the wedding ring? First of all, the jury saw the videotape. I believe the jury saw the videotape. A videotape like that is not going to be clear evidence of whether the ring is on her finger. What's more important is whoever killed the victim took the wedding ring off her finger. We hear testimony from the medical examiner that her finger was broken, her ring finger. The only finger that was broken was broken in a way that suggested something was tugged at. So the ring was on her finger when she was killed, and whoever killed her took that ring. Briefly, I'd just like to address some of the defendant talks about fingerprint evidence. First of all, this evidence was heard by the jury. It was brought out in cross-examination, and the jury simply rejected it. It applied its common sense to the overwhelming circumstantial evidence in this case, and it found the defendant guilty. The defendant, he points out that there was a fingerprint on the Ziploc bag that was with the gloves in it. It was, to be more precise, it was a fingertip print. And it was tested against the defendant's fingertip print, and it was found not to be a match. However, this bag came from a box of Ziploc bags that was in the parent's house. The fingerprint analyst was not able to compare it to the parent's fingerprints, because by the time she did her analysis, the parents had already been buried, and there were no fingertip print samples from them. So the fingerprint could have been from them. We don't know who it could have been from. Likely, it could have been from them. It came from a bag in their own house. The defendant's explanation that two mysterious strangers who, for all we know, have no motive, have no idea. These strangers, how would they know that the house in Aurora and the house in Naperville are somehow related, so that when they kill the Katherine and James in Aurora, they then know that the house in Naperville is where the parents live. Whoever did this was extremely close to this family and knew these relationships. So the defendant's explanation of a mysterious stranger doing this and then planting a bag with gloves in his car is simply not believable. Counsel, are you still taking the position there was only one offender? Yes, the evidence suggests there was one offender. Why not multiple offenders? Why not multiple offenders? I think all the evidence in this case pointed to the defendant acting alone. And if I can briefly address, I think you might be getting at the shoe print evidence. I think the defendant overstates that as well. And, again, this, too, was brought out to the jury, which rejected it. The testimony was that there were four partial shoe prints found in the house. If I recall, and I went back and looked over the testimony the other day, I don't believe it's clear that there were two separate shoe prints made. What the testimony was was, first of all, there was no official comparisons of these made. I believe the evidence technician testified that two of the partial shoe prints appeared to have similar patterns. There was no testimony that the other partial shoe prints had different patterns. So we don't necessarily know that it was two different shoe prints. We don't know what shoes the defendant was wearing when he was in the house or when he made his multiple trips to the house. So they were never able to compare the prints against his shoes. So, again, these sort of issues are distractions. And they can be affected when brought out to the jury. But here the evidence, which is overwhelming that the defendant committed these crimes and the jury, applying its common sense, drew the rational inferences from the circumstantial evidence and found the defendant guilty. If I can, if there are no further questions on that issue, I'll move on. And I'd like to briefly address the issues raised by my colleague in the order he addressed them. He first points to, excuse me, he first points to the testimony from Detective Niles that he told the defendant that Jennifer thinks you did this. First of all, it's important to note the standard of review here, but the defendant didn't mention that. This is an abuse of discretion standard. The trial court's decision to deny a motion in limine is subject to an abuse of discretion standard. And unless this court finds that its decision was so unreasonable or so arbitrary as to have no basis in law, then it should be affirmed. Here the evidence was clearly relevant. The defendant argues that it wasn't relevant to show what the defendant's comments in response to that were. And I disagree with that. It was relevant for that purpose, but it was relevant for a more important purpose. What it was relevant to is showing not the defendant's comments in response to that statement, but his actions following it. Why did the defendant, who was in L.A. and who had told Detective Niles that he was willing to meet with some of his detectives in Los Angeles, why did he then surreptitiously return to Illinois without telling Detective Niles, and in fact lying to Detective Niles and telling him he was still in Los Angeles? It goes to showing his consciousness of guilt and his intent to flee, and it was clearly relevant. Now, again, of course, if there was a risk of prejudice from that evidence that substantially outweighed that probative value, then the trial court in its discretion could have refused to allow it to be entered. The court here found otherwise, and I don't believe that the defendant has shown that that was an abuse of discretion. In other words, that it was so unreasonable or so arbitrary of a decision. Again, just briefly on the waiver issue, I think the defendant does point out cases where when a motion in limine is denied, it's not a waiver for the defendant to then go into that evidence. But here, if you look at the testimony, I think you'll see that the defendant's questioning of Jennifer went beyond the scope of that motion in limine. The motion in limine was directed towards the statements made to Detective Niles. Now, once that motion in limine was denied and the State was allowed to question Niles, the defendant didn't simply cross-examine Niles about those statements. The defendant affirmatively asked Jennifer herself about her statements and sort of broadened the scope. And it was the defendant who brought in Jennifer's own thoughts on the matter, rather than simply the non-hearsay purpose for which Detective Niles' own statements to defendant were brought in. And again, simply, even if it were error to bring this in, it was harmless error in light of the fact that the defendant was then able to use this testimony to his own benefit, essentially, and to argue a rush to judgment based on that. If I can move on briefly to the airline testimony. Here, too, it's important to note the standard of review. The defendant's claim here is that his lawyer was ineffective for not objecting to that second reference. So, again, the Strickland standard applies. The defendant has to show, first, that that failure was deficient performance, and then, second, that he was prejudiced by it. In other words, he has to show that there's a reasonable probability that had his lawyer objected to the second reference, there would have been a different result. And he can't show that here. I mean, excuse me. Counsel did object to the third reference and got a proper limiting instruction informing the jury to consider it only for the non-hearsay purpose that explained Ms. Taylor's actions, and not to consider it for the truth of the matter asserted. Had counsel objected to the second reference and gotten that instruction a little earlier, it simply can't be said that there's a reasonable probability that in that instance there would have been a different result. Again, this testimony was relevant for the purposes that it was introduced. It was relevant to showing Ms. Taylor's actions, and it was relevant to then showing how the defendant reacted to those actions upon seeing her make that phone call, and then mysteriously disappearing from that terminal, going to another airline and buying a different ticket, and flying into O'Hare rather than Midway. Is that the evidence that he was conscious of what the phone call meant? How do we – tell me what the record shows. I think certainly the jury could have drawn that inference. He – obviously the defendant is on edge at this point. He's suspicious. He sees the airline agent make a phone call, and then he left. And so it doesn't – the jury certainly can draw the inference that – so the jury says, well, why? Why did he then leave? He just bought a ticket to fly back to Chicago. Why did he mysteriously leave from the – from that airline, go to a different airline, and buy a ticket into O'Hare? So the jury certainly could have drawn that inference, and it was certainly relevant for that purpose. But again, it's just important to note that this is a Strickland claim, and ultimately he has to show prejudice, and I – he simply can't do that here. Moving on to the forfeiture by wrongdoing issue. The defendant has made essentially two very important concessions here, and in his briefs. The first is that this testimony was non-testimonial. That means the Confrontation Clause does not apply. This is purely a matter of Illinois' state law of evidence. The second concession that the defendant just made is that he does not challenge a trial court's finding that he murdered Catherine with the intent to prevent her from testifying. The trial court made that finding, and he's not challenged it. That's important because that is the only finding required under the common law doctrine of forfeiture by wrongdoing. And it's actually important for another reason. The defendant raises the specter that if a separate showing of reliability is not required, it will open the floodgates to all sorts of unreliable testimony from deceased witnesses. The fact of the matter is that the finding that the defendant not only murdered the victim, but with the intent to prevent her from testifying, not an easy showing to make, the fact that the court found that drastically narrows the category of hearsay that is allowed in under this exception. It only allows in hearsay from a defendant who intended to keep a victim from testifying. When it does, in such cases, the forfeiture by wrongdoing exception equitably extinguishes the defendant's rights to hearsay rights and confrontation clause rights. In fact, it would undermine the very purpose of the forfeiture by wrongdoing act to require a separate showing of reliability. Here you have cases where the defendant is found to have not only murdered the victim, but to have done so with the intent to prevent her from testifying. To then turn around and allow that defendant to argue that unreliable hearsay is being introduced is inequitable and it allows the defendant to profit from his actions. And that's precisely what the forfeiture by wrongdoing exception is meant to prevent. Now, it's important to note that the common law doctrine has never required a separate showing of reliability. It's not to be found in the federal rule of evidence, which the Supreme Court in Davis v. Washington noted is a codification of the common law. This court recognized the common law doctrine in Stetchley. The appellate court recognized it in People v. Melker. And in none of these cases, nor in any of the federal cases cited in the briefs, has any court required a separate showing of reliability. The defendant, in his reply brief, cites the United States v. Densa. It's important to note that that case, in fact, explicitly declined the defendant's invitation to require a showing of reliability, a separate showing of indicia of reliability or trustworthiness. What that case did was to say that, of course, the general rule of evidence in the federal system, it's rule 403, and that's the rule that says if the prejudicial effect of certain evidence substantially outweighs its probative value, then otherwise admissible evidence can be deemed inadmissible. And, of course, Densa said that that rule applies as it does to any type of evidence, and it would apply here. But, again, that's a question for the trial court, and it's left to the trial court's discretion to determine whether or not the unfair prejudicial effect of certain evidence would substantially outweigh its probative value. So, essentially, all defendants' arguments in this regard are asking for a new rule when no new rule is necessary. Illinois recognizes that same rule 403 as the federal courts do, and it can be applied in cases where, for instance, where a dream, where the deceased declarant has mentioned a dream, and that's brought in. But here, even if reliability were required, the statement here was clearly reliable. First of all, Jennifer was subject to cross-examination. So, essentially, when defendant points to Jennifer's motive to lie or her, the problems with her testimony, those are all solved by cross-examination of Jennifer herself. Catherine's statements, in fact, were corroborated. The defendant made a similar threat to Allison, and the defendant, indeed, the defendant himself concedes, conceded in his testimony that this confrontation between him and Catherine took place. Indeed, he recounted it to his cousin Bob in a letter. Now, the fact that when he recounted it to Bob, he used slightly different language is immaterial. The fact of the matter is he conceded to Bob that he threatened Catherine in that very circumstance at that very time. So, again, these, the things that the defendant points to here, while they might go to the weight the jury should give to this testimony, they don't go to its admissibility. I believe those were the only issues addressed by my colleague on the guilt phase. If there are no questions on those, I'll move on to some of the sentencing phase issues. The first issue the defendant raised, or I believe the only issue the defendant raised, is the warden issue. And, again, it's important to note here, too, the standard of review. This testimony was not objected to, and, therefore, it's subject to reversal only under plain error or under the standard the defendant now seems to be urging of Strickland. Counsel, do you concede that the defendant's aggravated kidnapping conviction should be vacated? Yes, I concede that the conviction should be vacated. But the conviction in no way affects the sentence. And it's important to note here, there are two separate issues here. The first is, did the presence of that invalid aggravating factor affect the jury's eligibility finding? And then the second is, did that aggravating factor affect its sentencing decision? First on the eligibility finding, the fact that the jury found three separate and independent aggravating factors renders the presence of the aggravating kidnapping factor harmless. That's clear from the case law, this Court's case law, and federal case law cited in our brief. The next question, however, is did it affect its sentencing decision at the second stage of the proceedings? And, again, here there are two separate issues that I think the Supreme Court laid out in Brown v. Sanders. The first is, did the presence of that factor create constitutional error? And the second is, if it did create constitutional error, was that error harmless? I would say here that the defendant can't show either error or harmfulness. First on the error issue, that is what was addressed in Brown v. Sanders. And Brown v. Sanders and then this Court's decision in People v. Patch, which I believe came before Brown v. Sanders, were essentially identical situations. You had cases where an invalid aggravating factor in People v. Patch, the same factor, in fact, aggravated murder in the course of the kidnapping, were vacated because the evidence didn't support them. The question then became, though, did that fact in any way skew the jury's sentencing decision? And both this Court and the Supreme Court held that there were no error in those cases, because under the catch-all factor, or the factor that allowed the jury to look to all facts and circumstances about the defendant or about the crime, the presence of that factor meant that the jury did not consider any facts or circumstances that it otherwise couldn't have considered. So as this Court wrote in Patch, even though the jury should not have considered the defendant's restraint of the victim in terms of it being a felony, it was entirely proper to have considered the defendant's identical conduct as an aggravating factor. And that's precisely what it did here. So the fact that the defendant's conduct didn't amount to the felony of aggravated kidnapping doesn't mean that that underlying conduct itself was not aggravating. And it was aggravating for two reasons, at least two reasons, that the jury surely could have considered. First, it was an attempt to conceal a crime scene, and for a while it was successful. By moving the bodies, the defendant concealed the fact that the Naperville home was also a crime scene. It was also aggravating just for the simple fact that the defendant unceremoniously just dragged his parents' bodies from one house to another. That's certainly a factor that a jury could have considered as aggravating. So the fact that the jury could have considered those factors under the catch-all instruction means that its decision wasn't skewed in any way, and under Brown v. Sanders and People v. Patch, there was no constitutional error. However, even if there were, even if this Court were to find constitutional error, the next step is to go on to harmless error analysis. And this Court conducted harmless error analyses in People v. Shaw and in People v. Williams. And the defendant points to People v. Brownell, a case from 1980, which didn't apply harmless error analysis. That case came before all these other cases I've mentioned, and in fact, People v. Williams noted that cases post-Brownell have applied harmless error analysis. The Court did so in Shaw, and it did so in Williams itself, and in fact, that sort of analysis is entirely consistent with Brown v. Sanders, which itself was only addressed to error, and having not found any error, didn't have a need to go on to harmless error analysis. Were this Court to go on and conduct a harmless error analysis, this case is entirely distinguishable from People v. Shaw. And I think the Court can say beyond a reasonable doubt that the presence of that invalid factor did not affect the jury's sentencing decision. Here we had a case of overwhelming evidence and aggravation. The defendant has not, essentially not contested that. We have the Court, the jury found the premeditated murder aggravating factor and the multiple murder aggravating factor. The murders of Catherine and James were brutal. We have the defendant's attempt to conceal the crime scene. We have his flight. So the aggravating evidence here was much stronger than it was in Shaw. On the other side of the ledger, we have very weak mitigating evidence. There was the testimony from the warden, which essentially amounted to if the defendant got a sentence of life imprisonment rather than death, it wouldn't simply be a slap on the wrist. There was no method of making that specific to the defendant himself. It was just very general. And then there was testimony from the defendant's psychological expert who testified that he had narcissistic personality disorder, which she explained meant that he lacked empathy for others. This was certainly not testimony that the jury would have given very much mitigating weight to. So in light of the fact that even if the aggravating kidnapping factor was invalid, it was invalid in such a minor way. The jury still was able to properly consider the underlying conduct. The fact that it might have considered the conviction itself was harmless beyond a reasonable doubt in light of the overwhelming evidence of aggravation compared to the extremely weak evidence in mitigation. If I could briefly return to the issue about the warden's testimony. Again, this was, first it was perfectly proper for the state to make a limited inquiry into this area, an area which was first raised by the defense counsel himself. And in that regard, the defendant now seems to argue, and I believe he argued in his brief, that counsel was ineffective, defense counsel was ineffective for even bringing up this line of inquiry. To succeed on a claim like that, the defendant would have to show, one, that counsel's performance was deficient. And on this record, as in most cases on direct appeal, the court is simply not in a position to know whether counsel's performance in that regard was deficient. First of all, we don't know whether defense counsel had a strategy. Indeed, I believe counsel mentioned that he could have had a strategy in this regard of bringing out this evidence. The court's simply not in a position at this time to know what that strategy was. I will note, however, that in assessing counsel's performance, the court is to look to counsel's performance as a whole, not to simply look to one instance and to say from that one instance that counsel's performance as a whole was so below the bounds of professional competence as to be unreasonable. But in any event, defendants simply can't show prejudice here. Again, in light of the extremely overwhelming evidence in aggravation and the extremely weak evidence in mitigation, it simply can't be said that counsel's performance as a whole was deficient. It simply can't be said that there's a reasonable probability that had counsel not brought this up, the result of that sentencing proceeding would have been different. If there are no further questions, I ask the court to affirm the judgment of the trial court. Thank you. Justice Brooke, I apologize for not getting to the aggravated kidnapping if you're interested in it, so I would like to talk about that. The prejudice under Brown v. Sanders on the facts of this case relates to what the jury was able to consider as a result of the invalid aggravated kidnapping conviction and eligibility finding that it would not otherwise have considered. And on the facts of this case, we have the testimony from the doctor who conducted the autopsy that the heart would keep beating for some period of time in some situations after brain death. And this was capitalized on by the prosecutor in his argument seeking the death penalty because he emphasized that the defendant's parents were moved while their child was beating. And he several times emphasized not only that, but that they had already found the eligibility factor. So that was another eligibility factor that they could consider that they shouldn't have considered. And he also emphasized that they had already found that the defendant should be convicted of the substantive offense of aggravated kidnapping. And this case is similar to the cases I rely on in that respect because it went beyond what the jury otherwise would have heard. In Pash, the basic problem was they charged him with aggravated kidnapping when in fact there was no secrecy about the kidnapping, but a person had been held hostage. So this court said in that case that it's the same conduct, he was just prosecuted under the wrong felony description. But here there was no aggravated kidnapping. The parents were brain dead within moments of being shot. I have no way of knowing whether their hearts were beating, but that's irrelevant because they were dead. And it always troubles me when my opponents argue harmless error because the aggravation is overwhelming and they characterize the mitigation as insignificant. It only takes one juror to spare any of my clients' lives. And in recent months, jurors in Cook County have spared two defendants in the Browns Chicken case who brutally murdered eight people. And in the Andre Crawford case, he's a serial killer, he was convicted of murdering 11 different women. And two jurors held out against death. And who's to say that couldn't have happened in Eric Hansen's case if the jurors hadn't been overwhelmed with this future seriousness stuff. We had people being murdered in 1980 at some medium security prison in 2007 in Stateville, and they give the correctional officers names, and the prosecutor raises the emotional appeal of hearts beating when the bodies were being moved. All I'm saying to your honors is that the aggravation may have been strong, but it was pretty much limited. To these convictions, these four murders. And there was mitigation. My client spent a lifetime in special education. He had attention deficit and hyperactivity disorder. He had learning disabilities. His mother several times attempted suicide because her husband was having an affair. My client's not a saint, but he's a human being. And any one juror could have spared his life. And so I think that for the assistant attorney general or state's attorney to characterize this as harmless error is inaccurate and unfair to my client's opportunity to be sentenced to life in prison, which is the mandatory alternative to the death sentence in this case. If we accept that argument, counsel, would we be changing existing law? No, your honor. I'm not saying you can't apply harmless error. Because the prosecutor characterizes the aggravation as overwhelming. Because it's not overwhelming. And because even if it were, there may be some mitigation here which a single juror could have latched onto. Somebody who was sympathetic to a special education student. Somebody who was sympathetic to the difficulty of parenting a child with attention deficit disorder. And I'm not saying. That would be changing the law, though, right? You said even if it is overwhelming, which would be part and parcel of the harmless error test. I mean, you're asking us to, even in the light of overwhelming evidence, if we feel that one juror's mind might be changed, then we should rule. I understand you don't like their argument as to harmless error. What I don't like is the excessive use of harmless error in a context of the death penalty, which can be such a subjective judgment. But it would be arrogant of me to tell you that you can't say it's harmless error. I'm just asking you to be more cautious in applying the harmless error doctrine in this context. This is unlike the trial context where there's a unanimous jury saying the guy is guilty. In a death penalty hearing, it only takes one. It only takes one juror with some modicum of empathy based on the evidence, based on the mitigation. And that could have happened in this case. Justice Garment's question was difficult for me. But all I'm saying is don't rush the harmless error in the death penalty context. Thank you.